WILBUR TAYLOR, DECEASED, AND GLADYS P. TAYLOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Taylor v. Commissioner
Docket No. 20695-83.
United States Tax Court
T.C. Memo 1987-133; 1987 Tax Ct. Memo LEXIS 125; 53 T.C.M. (CCH) 341; T.C.M. (RIA) 87133; March 11, 1987. *125 Held: Proceeds from sale of gravel taxed as ordinary income not capital gains and entire proceeds includible in petitioners' income. Jo Karen Parr, for the petitioner. Helen C. T. Smith, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: On April 14, 1983, respondent determined a deficiency in the Federal income tax of petitioners [1] for the calendar year 1979 in the amount of $15,954.77. By amended answer respondent seeks an additional deficiency in the amount of $19,221.23. After concessions, one issue to be decided is whether the sum of $34,617.53, constituting unreported income from a joint venture, [2] should be taxed as ordinary income or as capital gains. The amended answer raises the additional issue that all of the income from this joint venture should be taxed to petitioners. Respondent has the burden of proof on this second issue. Rule 142(a). [3]
*126 FINDINGS OF FACT Some of the facts have been stipulated and they are so found. During the year 1979, Mr. and Mrs. Taylor maintained their residence in Brooklyn, New York. At the time she filed the petition in this case, Mrs. Taylor was a resident of Montgomery, Alabama. In 1974, Mrs. Taylor acquired an undivided interest in approximately 47 acres of land located in Montgomery County, Alabama. In 1977 she became the sole owner of this land and continued as owner through the date of trial. In 1979, the land was vacant, bordering on a county road. The land is located near the site of construction of an interchange with Interstate Highway No. 85 near Montgomery, Alabama, the State of Alabama Project RS-5115(101), being described as the "Auburn University in Montgomery (AUM) Interchange." During 1979 the State of Alabama awarded a contract to Newell Roadbuilders, Inc. (Newell) for construction of this project. Fill dirt was required for the construction project. Because Mrs. Taylor's land was close to the project and contained road building materials consisting of a mixture of sand, clay, and gravel required for project specifications, Newell opened negotiations with Mrs. Taylor *127 for the removal of fill dirt from her property. Mrs. Taylor referred Newell to her son, Richard Bowden (Bowden), who was then living in Montgomery, Alabama, where he was a part-time student. She arranged for her son to handle all the negotiations with Newell, and if a contract were entered into, to administer the contract for her. On March 13, 1979, following negotiations, a document on a State of Alabama Highway Department form styled "Materials Option" was entered into between Newell and Mrs. Taylor as the landowner. This contract was signed by Mrs. Taylor. The Materials Option document purports to grant to the State of Alabama, acting through Newell as its contractor, "the exclusive right to remove all of the road building material" from approximately 30 acres lying on the southerly part of the 47-acre tract. Payment for the road building materials removed is at the rate of $ .30 per cubic yard as calculated by the State Highway Department. Necessary related rights for the use of the land in order to remove the materials are granted in the document. The document also specifies that topsoil would be stripped and stockpiled, that the finished elevation of the pit would have *128 a 6:1 slope so that surface water would stand in the pit, that the pit would be topsoiled and grassed, and that any access road and other disturbed areas would be restored to their original state. The written document does not specify the quantity of materials to be removed, but does specify that excavation will be completed by "approximately March 15, 1980." Newell and Bowden agreed orally that the excavation would stop approximately two feet above the water line which would necessarily leave in place some of the gravel. Newell informed Bowden that it was estimated that between 240,000 and 250,000 cubic yards of gravel would be removed. Newell also agreed to advance the sum of $10,000 to Mrs. Taylor to be used in part to compensate a tenant farmer who was then utilizing the surface of the ground. Bowden kept his mother fully informed as to the state of the negotiations. She and he agreed that payments from Newell would be deposited in a joint savings account with right of survivorship which had been established in their names on October 24, 1978, in the First Alabama Bank of Montgomery, Alabama. [4] The $10,000 advance payment was made on March 19, 1979. On March 20, 1979, $6,500 *129 of the payment was deposited by Bowden into the joint bank account and the balance of $3,500 was apparently paid in some form to the tenant farmer or for expenses. Road building materials were removed from petitioner's property beginning in April 1979. Newell employed two individuals part time to count the number of truck loads of materials removed. Ultimately 246,918 cubic yards of materials were removed from the property. Newell paid the aggregate sum of $72,879.30 during the year 1979. A final payment of $1,196.10 was made on September 15, 1980. In addition to the $10,000 advance made in March of that year, Newell paid by check payable to Mrs. Taylor the sum of $24,014 on June 20, 1979, all of which was deposited in the joint account. On July 26, 1979, Newell made a second payment by check to Mrs. Taylor in the amount of $22,653.90, all of which was also deposited in the joint account. On August 23, 1979, Newell paid by check to Mrs. Taylor the sum of $11,267 and on August 27, 1979, the *130 sum of $11,000 was deposited in the joint bank account. While it is probable that the $11,000 deposit came from the $11,267 payment, we cannot make such a finding. Mrs. Taylor personally endorsed that Newell check. On October 5, 1979, a check was issued by Newell to Mrs. Taylor in the amount of $4,944.40 which sum was deposited in the joint bank account. The 1980 check in the amount of $1,196.10 bears Mrs. Taylor's endorsement but apparently that sum was not deposited in the joint bank account. During the year 1979, Mrs. Taylor withdrew the sum of $500 from the account. During 1979 Bowden withdrew the aggregate sum of $19,912.19 from this account in varying amounts, the smallest being $230 and the largest $4,944. The use and ultimate disposition of these funds cannot be determined on this record. During 1980, Mrs. Taylor withdrew a total of $23,504.19 from the account and Bowden withdrew a total of $31,000. Again we cannot determine from this record the specific use or purpose of any one of these withdrawals. However, during either 1979 or 1980 or both Bowden with Mrs. Taylor's consent made two withdrawals in the amounts of $3,000 and $3,500 as loans. We note that there was *131 a $3,500 withdrawal on February 13, 1980, and a $3,000 withdrawal on June 5, 1980. There were no withdrawals during 1979 in either of these amounts. These loans were not repaid. Also some portion of the funds in this joint bank account were utilized by Mrs. Taylor or by Bowden for her account to defray the costs of construction of a residence for Mrs. Taylor in Montgomery, Alabama. During 1980 there were deposits in the account in the aggregate amount of $5,600 which are not accounted for by any payment from Newell. The joint savings account generated the sum of $1,296.01 during the year 1979 as interest on the funds on deposit. During the first 6 months of 1980 the account earned $356.00 of interest. In 1979 or 1980, or both, some of the funds on deposit were withdrawn for investment in money market funds. We are not informed as to amounts, dates, details of the investments, earnings, or disposition of the invested funds. Some of the unexplained withdrawals and deposits may have been made in the course of the money market fund investments. There was no written agreement of any kind entered into between Mrs. Taylor and Bowden with respect to this matter. No partnership return *132 was filed. Bowden on his 1979 Federal income tax return reported as interest income the sum of $648 from First Alabama Bank, which is equal to one-half of the interest earned in that year. He also reported royalty income of $36,440 which is stipulated to be one-half of the sum paid by Newell during 1979 to petitioner. [5] The 1979 return of Mrs. Taylor, which on its face purports to have been filed on behalf of Wilbur and Gladys Taylor but was signed only by Gladys Taylor, does not include any of the proceeds paid by Newell and there is no interest income from the First Alabama Bank reported. The omission of the Newell proceeds was on the advice of Mrs. Taylor's accountant. No interest, dividends, or other income is reported on either 1979 income tax return which is identified as related to money market investments of the Newell payments. Bowden claimed expenses amounting to $4,860 relating to the royalty income on his 1979 return but did not claim any depletion. The return explains this deduction as consisting of an attorney's fee of $1,500 and $3,360 as "salary" paid to have the number of trucks counted. On that return, Bowden also claimed a casualty loss after insurance reimbursement *133 of slightly more than $27,000. OPINION Character of Unreported Income
Whether income derived from a contract providing for the removal and sale of minerals in place is to be treated as capital gains or ordinary income depends upon whether or not the taxpayer retained an economic interest in the minerals in place, or whether the transaction constitutes a sale of the minerals in place. The economic interest test depends on proof that the taxpayer acquired by investment an interest in the minerals and as a result of the disposition must look to the extraction of the minerals for a return of his capital. , affd. per curiam on another issue . Petitioners rely heavily on , affd. without published opinion , while respondent argues that the case is controlled by , a companion case. The choice *134 between these two lines of authority depends largely on our interpretation of the agreement between Mrs. Taylor and Newell. As was true in both Ellis and Collins, the written agreement in this case is not artfully drawn. It is described as an option although no mechanics are established for exercise or lapse of the option. By its express terms it grants to Newell the right to remove road building material which in this case was a combination of sand, clay, and gravel. The area from which the road material was to be removed is described with adequate certainty as is the period of time during which removal was permitted. The grant purports to be of the right to remove all of the road building material although Newell and Bowden orally agreed that gravel below the water level would not be removed. [6] The written agreement does not purport to obligate Newell to remove all of the road building material or all of the material above the water level; the language is permissive, not mandatory. Nowhere in the written agreement is there any reference to a fixed quantity of material to be removed. Newell's representative estimated the quantity to be removed to be between 240,000 *135 and 250,000 cubic yards, but petitioners do not seriously contend that this estimate constituted a contractual obligation to pay for not less than 240,000 cubic yards of material, irrespective of whether or not removed. Petitioners do argue that once Newell began excavation, "the agreement obligated it to remove all of the materials." We do not so understand the agreement. There was a $10,000 advance payment made by Newell to Mrs. Taylor which payment probably would have been forfeited had Newell not removed an equivalent number of cubic yards. That factor is not, however, critical to our analysis. In Collins, we concluded that under all the facts and circumstances the parties intended that all fill dirt was to be removed and that the owner "was to be paid therefor unconditionally." (.) As a result we determined that there had been a sale of minerals in place. In Ellis by contrast, we concluded that a set amount to be extracted was not predetermined. Therefore, the taxpayers' *136 compensation was dependent on the extraction of the fill dirt. Similarly in , we concluded that the seller's entitlement to income from the removal of the gravel was inextricably tied to the extraction thereof.[7] Here, as in Lesher and Ellis, the quantity of gravel removed was determined by the state highway department and payment was based upon the quantity removed as so determined. We therefore conclude that Mrs. Taylor retained an economic interest in the gravel in place; hence the payments made by Newell to her constitute ordinary income, not capital gains. Amount of Income Taxable to Petitioners
The parties agree that during the year 1979 Newell paid to Mrs. Taylor the sum of $72,879. The statutory notice allowed depletion in the amount of $3,643.95 leaving net income of $69,235.05, half of which or $34,617.53 is included in Mrs. Taylor's income by the statutory notice. Respondent in the amended answer contends that the entire net income of $69,235.05 should *137 be included in Mrs. Taylor's income. [8] The issue of whether a binding agreement existed between Mrs. Taylor and Bowden to share in some fashion the proceeds from the sale of the road building materials is factual and the burden of proof as to the increase asserted in the answer is upon respondent. However, we find that there is adequate evidence in this record on which to make a determination on the merits without reference to the burden of proof. The statutory notice describes the relationship between Mrs. Taylor and Bowden as one of joint venture. The petition takes the same position. No partnership returns were ever filed and no written agreement of any kind was entered into. The position of petitioners is not altogether clear in that Bowden in his tax return reported as royalty income one-half of the gross payments by Newell to Mrs. Taylor and claimed $4,860 as expenses. On brief, that part of the proceeds claimed by Bowden is described by Mrs. Taylor's counsel *138 as compensation paid by Mrs. Taylor for Bowden's services in negotiating the contract and supervising the extraction. [9] We think it is relatively immaterial how the parties describe the arrangement. Even if a joint venture had been intended, Bowden's share obviously would have been compensation for his services. The important question which we must resolve is whether or not there was in fact an agreement between mother and son to divide the proceeds. The only evidence in this record in support of Mrs. Taylor's contentions is the testimony by Mrs. Taylor and by Bowden that there was such an agreement, accompanied by the fact that Bowden did report on his 1979 tax return one-half of the gross proceeds. [10] There are, however, both objective facts and conflicting testimony by Bowden which cause us to doubt the bona fides of this self-serving testimony and to decline to accept it. Mrs. Taylor testified not only that she and her son agreed to divide the proceeds equally but that they in fact did divide the proceeds. Bowden testified similarly that he and his mother shared the net proceeds and *139 that he was reimbursed out of the joint proceeds for expenses which he paid. If that testimony is correct, then Bowden's 1979 income tax return is of course false in this respect. Bowden also testified that the interest earned in 1979 was divided equally although he was not sure about the interest earned in 1980. In his income tax return he reports as interest one-half of the amount shown by the written records to have been earned on the savings account. Bowden's testimony is, however, inconsistent with his and his mother's contentions. Bowden explained that he never withdrew any money from the account without first consulting with his mother, and that the only money he appropriated to his own use were two withdrawals totalling $6,500 which he "borrowed" from the account but did not restore. He further testified that in 1980 he "allocated" a substantial *140 portion of his alleged share back to his mother to be used by her for the construction of her home in Montgomery, Alabama. It is true that substantial withdrawals from the account were made by Bowden, but the purpose of the withdrawals except for the withdrawal of $3,500 in February 1980 and $3,000 in April 1980 (based on Bowden's testimony) is unknown. Bowden testified that investments were made in money market funds but he chose not to provide any details. Neither mother nor son claims to have paid tax on any earnings for money market funds in either year. We cannot fail to note that Bowden testified that he had kept a log or journal of the monies received, that he also kept a log or journal of the expenses incurred but he testified "I don't have it with me" and finally in answer to an inquiry by the Court as to withdrawals Bowden responded "I would have to check my records to be certain, Sir." Finally with respect to the investments in money market funds, Bowden advised the Court that he could get the information and return to Court with it, but no effort was made by petitioners to do so. We are not required to accept the uncontradicted testimony of a witness if we find the *141 testimony to be "improbable, unreasonable, or questionable." , revg. a Memorandum Opinion of this Court. We are entitled to look at the substance of a witness' testimony as well as conclusions, and such testimony must be weighed along with all other relevant evidence. , affg. , cert. denied . We find the testimony of Mrs. Taylor and of Bowden in this case to be both improbable and questionable with respect to the existence of the alleged agreement to share the Newell proceeds. That testimony is simply belied by the objective facts and by Bowden's own testimony. No matter what assumptions one makes as to the withdrawals, neither the proceeds nor the interest earned was shared equally between the parties during this period of time. With such an agreement in effect, it is inconceivable that someone, either Mrs. Taylor or Bowden or both, would not have kept some kind of a record showing the receipt of proceeds, the payment of expenses, and the disposition *142 of the proceeds. Apparently Bowden had those records but failed to bring them with him to the trial. Thus, we infer that the evidence if presented to the Court would have contradicted the contention of the parties. ; . With Bowden's large casualty loss during 1979, it is probable that the family unit would realize tax savings if Bowden reported part of the gross proceeds from Newell. But whatever the motivation may have been, we are convinced that there was no agreement to share the proceeds. One final point requires comment. Item 12 of the stipulation states in part that "Newell paid Petitioner for said road building materials in accordance with the terms of the Option Agreement dated March 13, 1979." Paragraph 13 insofar as pertinent reads: "Petitioner and her son, Richard Bowden, shared the proceeds from the sale of road-building materials to Newell on an equal basis. During 1979, Newell paid Petitioner a total of $72,879.00 for road-building materials." There was some preliminary discussion between the Court and counsel for each of the parties *143 with respect to the quoted portions of the stipulation although the significance of the word "shared" was not discussed. However, counsel made it clear to the Court that neither one of them intended to stipulate away the issue of whether Mrs. Taylor and Bowden were engaged in a joint venture or had an agreement to share the proceeds. We are not bound to accept the parties' stipulations when they are contrary to the evidence before us. . We are uncertain of the significance which counsel for either party intended to attribute to the word "shared" in this context. It may, of course, be argued that to the extent that Bowden borrowed $6,500 from the account which he did not return, there was a sharing of the proceeds but certainly that was not an equal sharing. Petitioners do not argue that the stipulation forecloses respondent's contention that the entire proceeds are taxable to Mrs. Taylor. We feel constrained simply to ignore this part of the stipulation. Decision will be entered under Rule 155.
Footnotes
1. The statutory notice in this case was issued in the names of Wilbur Taylor, deceased and Gladys P. Taylor. The petition was filed in the name of Gladys P. Taylor only, although it recites that she is the surviving wife of Wilbur Taylor. By order dated August 24, 1983, the caption was amended to read as above. The parties have stipulated that no executor or administrator was appointed to administer the estate of Wilbur Taylor and there is nothing in the record as to whether or not he died testate or intestate and whether he had any assets or any heirs or next of kin other than Mrs. Taylor. Since neither party is concerned with the status of the estate of Wilbur Taylor vis-a-vis this proceeding, we leave that matter as we find it. ↩
2. The term "joint venture" is used in the statutory notice and in the original petition. We use it here simply for convenience to describe the issues, but use of that terminology does not constitute a determination by us that Mrs. Gladys P. Taylor and her son Richard Bowden were engaged in a "joint venture" for purposes of Federal income taxation. Wilbur Taylor, deceased husband of Gladys P. Taylor, was not connected in any way with the transactions the tax consequences of which are in issue here. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. On January 15, 1979, Mrs. Taylor withdrew $9,000 from this joint account leaving a balance of approximately $75 in the account. The source of the money then on deposit is unknown.↩
5. The record reflects that one-half of the total payments by Newell to petitioner during 1979 would be $36,439.50.↩
6. Whether this modification of the written contract was binding on both the parties, we need not here determine. The parties in fact abided by the provision.↩
7. There is no disagreement between the parties that Mrs. Taylor owned the gravel in place, thus meeting the first part of the "economic interest" test.↩
8. The amended answer alleges that respondent in the statutory notice determined that Mrs. Taylor's income was understated by the amount of $34,618.20. This minor discrepancy is unexplained but is immaterial.↩
9. Respondent argues that this is a new issue raised for the first time on brief.↩
10. Both Mrs. Taylor and Bowden testified that they entered into an agreement to share the proceeds and they testified that in fact the proceeds were shared. The parties stipulated that Newell "paid petitioner" for the road building materials, and that petitioner and her son "shared the proceeds * * * on an equal basis."↩